Filed 9/20/13  In re C.W. CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re C. W. et al., Persons Coming Under the Juvenile Court Law. | C072539 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>M. W.,<br><br>        Defendant and Appellant. | (Super. Ct. Nos. 11JVSQ2876201, 11JVSQ2876301, 11 JVSQ2876401) |

M. W. (mother), the mother of three minor children, C.W., H.C., and D.C., appeals from the juvenile court's orders denying her petition for modification and terminating her

parental rights as to D.C. (Welf. & Inst. Code, §§ 395, 388, 366.26.)[1] She contends (1) the juvenile court abused its discretion in denying her section 388 petition seeking reinstatement of reunification services, and (2) the juvenile court erred in terminating her parental rights to D.C. because there is insufficient evidence he is likely to be adopted within a reasonable period of time and the beneficial relationship exception to adoption applies. We affirm.

## BACKGROUND

Mother has a long history of abusing marijuana, methamphetamine, and other drugs. She abused methamphetamine while pregnant with her oldest child, C.W., and was referred to treatment. She also used drugs while pregnant with her second child, H.C. In August 2006, while living in Minnesota, she and her third child, D.C., tested positive for cocaine at D.C.'s birth. Based on that positive test, all three children were removed from the parents' care. The parents were provided services including substance abuse treatment and parenting services. Mother completed her substance abuse treatment program in October 2006. The children were returned to the parents under supervision in December 2006. One month later they were again removed, when the parents failed to comply with the aftercare treatment plan and did not drug test. Mother relapsed in February 2007 and was referred again to drug treatment. She again completed the drug treatment program and also completed her parenting classes. Ultimately, mother completed her reunification plan and the children were returned to her in August 2007. Father did not complete his plan.

In November 2010 the Shasta County Health and Human Services Agency (the Agency) received a referral that father was emotionally abusing the children. The investigation revealed problems of ongoing domestic violence in front of the children,

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

substance abuse, and failures to meet H.C.'s and C.W.'s educational needs, and D.C.'s medical needs. H.C. and C.W. had missed over 30 days of school and the excessive absences were negatively impacting their school performance. H.C. told the social worker his parents hit and kicked each other. C.W. informed the social worker his parents fought all the time and mother harmed herself. Mother had been receiving services, including parenting therapy, but had difficulty consistently applying what she learned in therapy. D.C. also has a seizure disorder. The parents failed to take him to his last five doctor's appointments and were not giving him enough of his antiseizure medication. On at least one occasion mother failed to seek medical care for D.C. when he was having a seizure.

On January 12, 2011, the parents were arrested for being under the influence of a controlled substance and the children were taken into protective custody. The Agency then filed a petition under section 300, alleging the minors C.W., H.C., and D.C. were at substantial risk of harm because of their parents' substance abuse, anger control, domestic violence, and mental health problems. The trial court found the allegations of the petition true and took jurisdiction over the children. The parents were granted reunification services and visitation.

As of August 2011 mother had been unsuccessful in her reunification efforts. She consistently tested positive for methamphetamine, and was dropped from both the drug and alcohol program and parenting classes. During the reunification period, there were several instances of domestic violence by father. After one incident, the social worker took mother to a shelter to enter its program. Mother left the facility before completing the intake paperwork. Mother found "it virtually impossible to stay away from [father] and has been unable to focus on what she needs to do to reunify with her children because she is so focused on and worried about him." Mother and father knew "that they can be each other's worst enemy at times, and yet, they are as addicted to each other as they are to illegal drugs. Neither has been able to break away from the other long enough

3

to address the issues that have brought them to these circumstances. The parents have stated . . . their desire for the children to be adopted by their current caregivers."

In November 2011 the social worker sought termination of reunification services and requested the juvenile court set the matter for a section 366.26 hearing. The December 2011 addendum report noted the parents' reunification efforts had not improved since August. The parents had stated they were "grateful to be granted" additional services and were "adamant about their resolve to participate in services." Despite these claims neither parent attended drug treatment or communicated with the Agency. They continued to break up, reconcile, and then resume the cycle of domestic violence. They also both continued to use drugs. Following a hearing on January 6, 2012, the juvenile court terminated reunification services as to both parents and the matter was set for a section 366.26 hearing.

On May 4, 2012, mother filed a request to change the court order terminating her reunification services. She alleged she had "re-engaged in services" in that she had entered a domestic violence shelter and filed a request for a restraining order. She alleged this change would be in the children's best interest as it would "retain the strong bond between the mother and the children." She also requested funding for a parent-child bonding assessment. The trial court granted the motion for funds for a parent-child assessment.

In a July 2012 permanent plan review, the social worker reported mother visited the children consistently and the children appeared to enjoy the visits, though mother needed guidance from the visit supervisor regarding appropriate discipline, conversation, and supervision. Visitation was decreased to once a month in January 2012. Mother continued to participate in visits, and in April the quality of the visits began to improve. Her interactions with the children were positive and she was attentive, patient, and engaged with the children. She still made inappropriate comments to the children regarding her lack of drug use and D.C.'s medical condition.

4

The social worker reported the children had "a limited relationship with the parents. This relationship is not characterized by safety, security, or dependability. The parents participated in visitation with the children. The parents' interaction with the children during visits was not consistent. The parents' relationship with each other was tenuous; their behavior toward one another was unpredictable and could quickly become volatile. The quality of the visits improved when only the mother visited with the children; however, she still shows the need for support and guidance from the visit supervisor."

D.C. had significant health problems due to his prenatal exposure to drugs. He has a seizure disorder that requires medication, is developmentally delayed, and has orthopedic problems that cause him to walk with an abnormal gait. He was currently living in his fourth foster placement since being removed from his parents' care in January 2011. The original foster home could no longer provide for D.C. as his medical needs and behavioral challenges increased. D.C.'s current foster parents received specialized training and have the skills necessary to manage D.C.'s medical issues and behavioral problems. D.C. had been in this prospective adoptive home since March 8, 2012. He appeared comfortable with his prospective adoptive parents, sought their attention and affection, and responded well to their guidance. The prospective adoptive parents acknowledged D.C.'s behavior could be challenging to manage, but they were seeing improvement in his behavior as he became more comfortable with them and better understood their expectations. The social worker acknowledged D.C. presented significant challenges, including his cerebral palsy, seizure disorder, oppositional defiance disorder, attention deficit hyperactive disorder, and a developmental delay with his speech, that might restrict potential adoptive homes, but D.C. was also a loving, enjoyable, and adventurous boy. The prospective adoptive parents were committed to adopting D.C. The social worker concluded D.C. was adoptable.

5

Also in July 2012, Dr. James Harper conducted a psychological evaluation and a parent-child bonding assessment. He noted mother appeared "to have fewer resources available than most people for coping with the ordinary ideational and emotional demands of everyday living." When people with the same characteristics as mother are "confronted with ordinary levels of stress that most people can manage with self-assurance, they are at risk for becoming precipitated into episodes of subjectively felt distress, limited frustration tolerance, and poor impulse control." He thought it reasonable to infer that "[mother] currently functions best and copes most effectively in a structured, largely conflict-free environment such as" a domestic violence shelter. He also observed mother lacked self-awareness and was at risk for "adjustment difficulties involving inadequate understanding of herself, insufficient appreciation of the impact she has on other people, and a limited capacity to examine herself in a critical fashion and then modify her behavior accordingly." Mother's adaptive liability would likely "result in [mother's] failure to anticipate the consequences of her actions and to misconstrue the boundaries of appropriate behavior. Moreover, her inaccurate perceptions of people and events are likely to lead [mother] to erroneous conclusions and ill-advised actions, and faulty judgment is likely to undermine the adequacy of adjustment . . . . Notably, the extent to which she distorts reality is likely to prevent [mother] from maintaining an adequate adjustment for any length of time in multiple situations."

With respect to bonding, Dr. Harper concluded the children were strongly bonded to each other and their mother. He also concluded that "the quality of the bond/attachment between each of these children and their mother appears to be secure rather than anxious/insecure or disorganized." In the visit he observed, mother was able to exercise parental authority.

Dr. Harper concluded mother's "ability to function as a parent is severely impaired when she is actively using drugs. It is equally obvious that her 'then' (e.g.,ten-year) relationship with [father] was detrimental, not only to both parents and [mother] in

6

particular, but also to the children." He noted she had recently re-engaged in services and had filed a request for a restraining order. Despite the fact that mother "subjugated the children's needs . . . when they conflicted with her own emotional needs," Dr. Harper found that by filing the request for a restraining order against father and moving to a shelter, mother demonstrated a "genuine determination not to re-unite" with father. He concluded she was now focused on the children's welfare rather than her own. He acknowledged she would need ongoing services to sustain her current progress, including continuing therapy, stress management, and substance abuse treatment. That mother had filed a request for a restraining order against father and was living in a domestic violence shelter were significant factors in Dr. Harper's opinion that it was in the children's best interests to continue reunification services for mother.

The most recent proceedings represented the third time since 2006 the children had been placed in foster care. They had lived in an out-of-home placement for a total of 34 months, 16 months while in Minnesota and in the most recent proceedings 18 months. Mother had provided two recent negative drug tests and had an anticipated drug treatment completion date of February 2013.

Mother testified at the combined sections 388 and 366.26 hearing. She testified she had been clean and sober since February 2012, which at the time of the hearing was almost eight months. She reported this was the longest period of time she had stayed clean. She later testified she had been sober in Minnesota for 25 months before relapsing one month after the children were returned to her.[2] The children were removed again and she regained custody of the children by leaving father. She and father got back together a few months later.

_____

[2] The record of the proceedings in 2006 does not bear out the assertion that mother was clean and sober for 25 months during those proceedings.

7

In this case, after reunification services were terminated mother went to a domestic violence shelter and started drug and alcohol counseling, individual therapy, and parenting classes. She also participated in domestic violence support groups. She had sought a restraining order, but the women's refuge did not notify her about the court date, so currently there was not a restraining order against father in place. There was a criminal protective order in effect from October 2009 through October 2012. Despite that protective order, she had periods of time when she was back together with father.

Mother had been looking for housing for about one month. She had left the domestic violence shelter two days prior to the hearing, because she felt the way it was being run was "just ridiculous." She did not feel she got the support she needed. She also felt she had to leave the shelter or she was going to relapse into drug use. She found the place overwhelming. Mother also felt the shelter was a very chaotic environment and not fit for children. Because she had left the domestic violence shelter, she had to find a new domestic violence group and parenting classes.

Until she found permanent housing, mother was staying with friends she had met in her drug and alcohol class. She believed her room was large enough that she could put additional beds in the room for her children. She did not know if her friends had a history of mental illness or a criminal history. She knew they had children who did not live with them, although she did not know why. She believed they had a history with child protective services.

The juvenile court denied the section 388 motion. The court delineated the guiding legal principles and noted mother's "challenge is not completing services. The history of the case demonstrates that the mother can complete services and reunify with her children. This has been done by the mother on a number of occasions. Rather the real issue this Court must confront is can mom maintain sobriety and can she remain free of the domestic violent [*sic*] relationship." The juvenile court recognized mother had made changes, as she was now actively engaging in services. However, the situation was

"clearly still fluid; and by the time of this hearing, mom has exited the DV shelter, is living with individuals who appear to have substance abuse issues and are involved with children and family services. Mom did not secure the restraining order she filed. She missed the hearing in March and has done nothing in the past five months to refile the matter for further consideration by the Court." The juvenile court concluded mother had not demonstrated a sufficient change of circumstances to reinstate reunification services. The juvenile court also found granting the motion would not be in the children's best interests, as their interest was in stability and permanency.

The juvenile court also found the beneficial relationship exception to adoption did not apply. The juvenile court acknowledged mother had maintained regular visitation with the children. However, mother had not demonstrated the relationship promoted the well-being of the children such that it outweighed the benefit of a permanent home. The juvenile court noted Dr. Harper's report concluded it would be detrimental to the children to sever the parental relationship, but did not specify the severity of any such harm. The juvenile court also noted that Dr. Harper had relied on mother's engagement in services and obtaining a restraining order as significant factors in his conclusion, but "the validity of the opinion provided by Dr. Harper is significantly undermined by the changes in the mother's life. The mother did not complete the court process in order to obtain a valid DV restraining order for three years, and the mother is no longer living in a DV shelter." The juvenile court found the evidence did not support the conclusion that the beneficial relationship exception applied. "Simply, the strength and quality of the natural parent-child relationship in a tenuous placement does not outweigh the security and permanency adoption would offer to these children."

The juvenile court found the children were likely to be adopted and termination of parental rights would not be detrimental to the children. The juvenile court terminated parental rights as to D.C. and continued the section 366.26 hearing for 180 days as to C.W. and H.C. The permanent plan for the children was adoption.

9

## DISCUSSION

### I

Mother contends the juvenile court abused its discretion in denying her section 388 petition. We disagree.

Under section 388, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petition shall set forth why the requested modification is in the best interest of the dependent child. (§ 388, subd. (b)(4).) The parent bears the burden of showing both a change in circumstances exists and that the proposed change is in the child's best interests. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The juvenile court may consider the entire factual and procedural history of the case in considering a section 388 petition. (*In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450-1451.) The court must also consider factors such as the seriousness of the problem that led to the dependency, and the reasons for the problem's continuation; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child to both parents and caretakers. However, this list is not exhaustive. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

When a parent brings a section 388 petition after a section 366.26 hearing has been set, the best interests of the child are of paramount importance. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Therefore, the juvenile court looks not to the parent's interest in reunification but to the child's need for permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

We review a ruling denying a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 866.) We reverse only if the ruling exceeded the scope of the juvenile court's discretion, or if under all of the evidence, viewed most favorably to the ruling, no reasonable judge could have made that ruling. (*In re Jasmine D.* (2000)

78 Cal.App.4th 1339, 1351; see *Great West Contractors, Inc. v. Irvine Unified School Dist.* (2010) 187 Cal.App.4th 1425, 1459.)

These proceedings commenced in January 2011. Reunification services were terminated in January 2012. Thereafter, in February 2012, over a year after the children were removed from her custody, mother began participating in substance abuse counseling, parenting classes, and individual therapy. By the time of the hearing, she reported she had been sober for almost eight months. This modicum of self-reported good news was offset by the fact that she was not expected to complete her drug treatment until February 2013 and had moved from the domestic violence shelter into a single room provided by a couple she had met through her substance abuse recovery program, a couple with their own history of involvement with child protective services, and a couple whose criminal and mental health history was unknown to her. In addition, because she was no longer living at the domestic violence shelter, she had to find a new domestic violence group and parenting classes. It is true that mother initiated the process to obtain a restraining order against father, but she did not complete the process; she failed to appear in court and failed to take any additional action for five months, blaming the women's shelter for her failure to appear in court. Cast in the best possible light, mother's circumstances were in the process of changing, but that change was not complete.

Mother's history of substance abuse and domestic violence includes bright spots when sobriety is regained and restraining orders are obtained, but these are followed by drug relapse and reconciliation with her abuser. Eight months of sobriety and freedom from the domestic violence relationship is a good beginning for mother. But in the face of over 10 years of drug abuse and violence, and repeated recovery and relapse, it is just that, a beginning. It is not a long enough period to demonstrate changed circumstances. This is particularly true when she has had other periods of sobriety before a relapse. (See *In re Amber M.* (2002) 103 Cal.App.4th 681, 686.)

11

In addition, mother's psychological evaluation reveals significant barriers to her ability to care for her children. Mother relies on Dr. Harper's assessment as evidence that her petition should have been granted. Dr. Harper relied heavily on the fact that mother was residing at a domestic violence shelter and had obtained a restraining order against father to conclude it was in the children's best interest for mother to receive additional services. By the time of the hearing, mother's circumstances had changed. She had not obtained the restraining order, placed the blame for this failure on the shelter, and was no longer residing at the domestic violence shelter. This latter change was particularly significant, in view of Dr. Harper's opinion that mother had limited resources for dealing with ordinary levels of stress and functioned best in a structured, conflict-free environment such as a domestic violence shelter. Dr. Harper also concluded mother lacked self-awareness, had a limited capacity to engage in critical self-examination, and had adaptive liabilities that would likely lead her to ill-advised actions and faulty judgment. Furthermore, her distorted reality prevented her from maintaining adequate adjustments.

There is no evidence mother has increased insight into the root of her problems or how to avoid them in the future. There is a reasonable implication from the evidence that mother continues to make poor decisions and avoids responsibility for her actions. This is particularly true regarding her choice to leave the domestic violence shelter, the circumstances of her current living situation, and her inability to obtain a restraining order. Mother had not completed drug counseling, her living arrangement was still in flux, and she did not demonstrate she could provide a stable home for the children. It is not in the children's best interests for permanence to be delayed for an unknown or indefinite period of time. Nor is there evidence their need for permanence and stability would be served by further efforts at reunification. Based on this record, the juvenile court did not abuse its discretion by denying mother's section 388 petition.

12

## II

Mother next contends the trial court erred in terminating her parental rights to D.C.[3] She contends there is insufficient evidence supporting the conclusion he is likely to be adopted within a reasonable period of time. We disagree.

We review a finding of adoptability only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach the conclusion the child is likely to be adopted within a reasonable time. It is irrelevant that there may be evidence which would support a contrary conclusion. (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) We review the record in the light most favorable to the juvenile court's findings and draw all inferences from the evidence that support the court's determination. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

"The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt. [Citation.] It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent ' "waiting in the wings." ' [Citation.] [¶] Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311-1312.)

---

[3] C.W. and H.C. were not in a prospective adoptive placement and each had some behavioral problems. The Agency requested, and was granted, additional time to assess their permanent placement needs.

13

Having reviewed the record, we conclude there was substantial evidence to support the juvenile court's adoptability finding. There is no doubt that D.C. has significant challenges to his placement. He has been diagnosed with cerebral palsy, seizure disorder, oppositional defiance disorder, and developmentally delayed speech. On the other hand, he is also a loving, enjoyable little boy who is imaginative, sweet, and playful. His prospective adoptive parents are aware of his challenges and want to adopt him. They have received special training to help them meet D.C.'s medical needs and handle his behavioral challenges. His behavior was improving as he became more comfortable in the home and understood his prospective adoptive parents' expectations. In addition, there are 30 homes with completed home studies interested in adopting children with D.C.'s characteristics. This is sufficient evidence that D.C. is adoptable. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1525-1527; *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523-525, disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

### III

Mother also contends the beneficial parental relationship exception to termination of parental rights applied. We are not persuaded.

At the selection and implementation hearing, the juvenile court must choose one of four alternative permanent plans for a minor; the permanent plan preferred by the Legislature is adoption. If the minor is adoptable, the court must terminate parental rights absent a showing of detriment to the minor. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

Under limited circumstances the juvenile court may find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from

14

continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The burden is on the parent to make such a showing. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373.)

To establish this exception to adoption, mother must establish she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

The juvenile court's ruling declining to find an exception to termination of parental rights must be affirmed if it is supported by substantial evidence. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 809 (*Zachary G.*); *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Autumn H.*, at p. 576.)

"[F]requent and loving" contact is not sufficient to establish a sufficient benefit to overcome the preference for adoption absent a significant, positive, emotional attachment between parent and child. (*In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418-1419.) Neither a strong positive bond nor a "pleasant and emotionally significant" relationship with a parent is sufficient to defeat adoption when a child looks to a prospective adoptive parent to meet his needs. (*In re Derek W*. (1999) 73 Cal.App.4th 823, 827; see *Zachary G.*, *supra*, 77 Cal.App.4th at p. 811.)

15

Here, D.C. has lived out of his mother's custody for almost one-half of his life. While there was evidence he enjoyed visits with his mother and was attached to her, there was no evidence he had any difficulty separating from her. There was no evidence D.C. looked to her for nurturing and guidance. There is no evidence mother occupied a parental role in D.C.'s life. Mother had not progressed to having unsupervised visits and continued to need guidance from the visit supervisor regarding appropriate discipline, conversation, and supervision for the children. Mother's relationship with the children was limited and not characterized by "safety, security, or dependability." There was no evidence D.C. had a substantial positive emotional attachment with mother or that he would be greatly harmed by severing the relationship. On this record, we cannot find that any incidental benefit which might inure to D.C. in maintaining the relationship with mother outweighed the benefit D.C. will gain in a permanent home with new adoptive parents. The court did not err in terminating mother's parental rights.

## DISPOSITION

The judgment is affirmed.

_____RAYE_____, P. J.

We concur:

_____ROBIE_____, J.

_____HOCH_____, J.

16